```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
2                       HUNTINGTON DIVISION

3   _____x

4   GENBIOPRO, INC.,              : CIVIL ACTION NUMBER
                                  : 3:23-cv-00058
5                  Plaintiff,     :
          -vs-                    :
6                                 :
    MARK A. SORSAIA, in his official:
7   capacity as Prosecuting Attorney:
    of Putnam County and          :
8   PATRICK MORRISEY, in his      :
    official capacity as Attorney :
9   General of West Virginia,     :
                                  :
10                 Defendants.    :
    _____x

11

12                     MOTION HEARING
           BEFORE THE HONORABLE ROBERT C. CHAMBERS,
13              UNITED STATES DISTRICT JUDGE
                  MONDAY, APRIL 24, 2023

14

15

16

17

18

19

20

21

22        Proceedings recorded by mechanical stenography,
    transcript produced by computer.
23   _____
              CATHERINE SCHUTTE-STANT, RDR, CRR
24            Federal Official Court Reporter
               300 Virginia Street, East
25                Charleston, WV 25301
```

```
 1   APPEARANCES:
     For the Plaintiff:          ANTHONY J. MAJESTRO, ESQUIRE
 2                               Powell & Majestro
                                 Suite P-1200
 3                               405 Capitol Street
                                 Charleston, WV 25301
 4

 5                               DAVID C. FREDERICK, ESQUIRE
                                 Kellogg Hansen Todd Figel &
 6                               Frederick
                                 Suite 400
 7                               1615 M Street, NW
                                 Washington, D.C.  20036
 8

 9

10   For the Defendant          JENNIFER SCRAGG KARR, ESQUIRE
     Mark A. Sorsaia:           Putnam County Judicial Building
11                              12093 Winfield Road
                                Winfield, WV 25213
12

13

14

15   For the Defendant          CURTIS R. CAPEHART, ESQUIRE
     Patrick Morrisey:          West Virginia Attorney General's
16                              Office
                                Building 1, Room 26e
17                              1900 Kanawha Boulevard, East
                                Charleston, WV 25305
18

19

20

21

22

23

24

25
```

1        (The following proceedings were held before the

2    Honorable Robert C. Chambers, United States District Judge,

3    in the case of *GenBioPro, Inc.*, *versus Mark A. Sorsaia,* in

4    his capacity as Prosecuting Attorney of Putnam County, et.

5    al., on April 24, 2023, at Huntington, West Virginia,

6    beginning at 2:02 p.m.)

7        COURT SECURITY OFFICER:  All rise.

8        THE COURT:  Good afternoon.

9        Before we start the proceeding, I'm advised that we

10   have a number of individuals who are participating by

11   listening by telephone, so I want to instruct them that they

12   are reminded that there is a general prohibition against any

13   sort of recording or rebroadcasting of court proceedings.  A

14   violation of that prohibition could result in sanctions.  So

15   please make sure that you abide by that requirement.

16       I'm also advised they've already been instructed to

17   mute their devices, so hopefully that will continue

18   throughout.

19       So I appreciate counsel quickly making themselves

20   available for this hearing after the Court contacted you.

21       I've done an order which explains that I'm limiting

22   this hearing to a discussion of the standing issues

23   presented by the plaintiff's complaint.

24       Obviously, it's a necessary part of the Court's

25   deliberation over the pending motions to determine that

1  there is adequate standing as to both of the defendants, and

2  it's a threshold requirement.  So I felt it appropriate to

3  have a separate -- and hopefully successfully quickly

4  resolving this one way or the other in doing this as a first

5  step.  And consequently, I asked plaintiffs to be prepared

6  to first outline, since plaintiff has the burden of

7  establishing standing, the basis in the Complaint for

8  standing, and then to respond to the arguments that you've

9  seen raised by the defendant.

10      So who is presenting on behalf of the plaintiff?

11          MR. MAJESTRO:  Your Honor, Anthony Majestro for

12  the plaintiff.  I would like to introduce David Fredrick

13  from Kellogg Hansen in Washington, D.C., who will be

14  handling the argument for the plaintiffs.

15          THE COURT:  All right.  Thank you.

16      Welcome, Mr. Frederick.

17          MR. FREDERICK:  Your Honor, is it all right that I

18  speak from here?

19          THE COURT:  It is.  I'm going to ask all of you to

20  use the microphones whenever possible.  The acoustics in

21  this courtroom aren't particularly good, and the court

22  reporter is using a recording and -- using headphones to

23  hear through the system, and so it is necessary for you to

24  use the microphones.

25      With that, go ahead.

1          MR. FREDERICK:  Thank you, Your Honor.

2          David Frederick for plaintiff, GenBioPro.

3          We brought this case to challenge West Virginia's

4   Criminal Abortion Ban and associated restrictions under two

5   theories.  The Ban is preempted by the Food and Drug

6   Administration Amendments Act of 2007, the FDAAA, and the

7   associated FDA rules and statutes, and it breaches the

8   Commerce Clause of the U.S. Constitution.

9          The Ban seeks to override the FDA's approval of

10   mifepristone for its indicated use in the early termination

11   of pregnancy.

12          You've directed us to address standing.  And that's

13   what I'd like to focus on in my presentation today.

14          The tests for standing is three-fold:  injury in fact,

15   sufficient causal connection for the injury; and the conduct

16   complained of; and the likelihood that the injury will be

17   redressed by a favorable decision.

18          Now, I want to address the pleading standard for

19   standing because we are here on a motion to dismiss.  And

20   the Supreme Court said in the *Susan B. Anthony* case the test

21   for standing and the pleading requirements for standing

22   depend on the level at which the challenge is being made.

23          Because we are at the motion to dismiss stage, the

24   normal pleadings' standard for a motion to dismiss apply,

25   which means that we are charged with pleading plausibly that

1    we have standing.

2         Now, we understand and appreciate, Your Honor, that at

3    summary judgment we will be called upon to present proof

4    that would support the allegations made in the Complaint.

5    And we are prepared to do so.  And if asked by the Court, I

6    can outline some of those proofs that we would expect to be

7    presenting.

8         But for purposes of this argument, we believe we have

9    plausibly pleaded standing, because we plausibly pleaded

10   that we are injured by the state's ban, that it is causally

11   connected to the statements made by the attorney general and

12   the Putnam prosecutor, and that a favorable decision by you

13   declaring the state's ban and associated restrictions to be

14   unconstitutional under the Supremacy Clause and the dormant

15   Commerce Clause would redress the harm that we suffer.

16        So with that, let me just start by saying that the

17   generic form of mifepristone is GenBioPro's principal

18   product, and it sells throughout the United States, as we

19   pleaded in the Complaint.  We seek to sell in West

20   Virginia -- or seek to have distributed for sale because

21   GenBioPro is not a direct seller -- but through pharmacies,

22   telemedicine providers, mail health, pharmacies, et cetera,

23   and other distributors; and is precluded by doing so by the

24   statute enacted by the West Virginia legislature.

25        So the very first point is economic harm.

GenBioPro v Sorsaia, et. Al.

1        The Fourth Circuit has called this, quote, the

2   paradigmatic form of an injury to confer standing.  That's

3   the *Maryland Shall Issue* case decided by the Fourth Circuit

4   in 2020, and it quotes a decision out of this court, *Air*

5   *Evac EMS*.  That was a case involving interplay with health

6   providers.

7        Now, the attorney general admits that the Ban causes

8   harm to GenBioPro's, quote, bottom line.  And that ought to

9   be enough at the pleading stage for us plausibly to show

10  economic injury, that one concession there.

11       As the Fourth Circuit held in *Maryland Shall Issue*,

12  even a small amount of loss of money is ordinarily an

13  injury.  And like a gun owner in *Maryland Shall Issue* and

14  the beer vendor in the Supreme Court case of *Craig versus*

15  *Boren*, GenBioPro has lost business opportunities as a result

16  of West Virginia's unconstitutional laws.

17            THE COURT:  Here's the rub -- and this is what I

18  think the defendant points to -- GenBioPro does not allege

19  in the Complaint that they've had any past sales.

20       As I understand it, you've been in the business since

21  about 2019?

22            MR. FREDERICK:  That's correct.

23            THE COURT:  And so -- and you say that it's a

24  nationwide business.  Fair enough.  But you didn't allege

25  that you were already selling or already even taking steps

 1   to certify doctors or pharmacies under the more recent REMS.

 2        So when I looked at these cases, frankly, the first

 3   thing that occurred to me is that these other plaintiffs who

 4   you -- in the cases you noted were established as already

 5   doing business and already had direct sales to their

 6   customers in the states where they brought the cases and

 7   were asserting standing.

 8        And defendant argues that you've only stated a

 9   generalized intention to do business in West Virginia

10   and/or other states, but you haven't actually done business

11   in West Virginia.

12        So do these cases not require something more than just

13   an intention to engage in the business at some point?

14             MR. FREDERICK:  They do not.  There is not a

15   single case on point that they have cited that requires past

16   sales.

17             THE COURT:  Are there any cases that you've come

18   across where a similarly situated plaintiff sought standing

19   based on economic harm where they didn't already have past

20   sales or an existing customer relationship within the

21   targeted state?

22             MR. FREDERICK:  Yes.  The Fourth Circuit cited a

23   case out of the Seventh Circuit called *Ezell*.  And if I --

24   it's called *Ezell versus the City of Chicago*.  That was a

25   case involving firing range practice areas.

GenBioPro v Sorsaia, et. Al.

1    The company was one that said in the reported decision,

2    we sell throughout the United States, and we have intent to

3    create a firing range in the City of Chicago.  Because of

4    the ordinance passed by the City of Chicago, the firing

5    range facility operator was not able to provide a firing

6    range facility.  It obviously had not done any business in

7    the City of Chicago.  It wanted to do business.  And but for

8    the existence of the ordinance banning the firing range

9    facility, it would have been permitted to do so.

10    The Seventh Circuit said there is standing to bring the

11    challenge under the Constitution.  That was a Second

12    Amendment case.

13    But the Seventh Circuit said that there was standing

14    because there was economic harm due to the loss of

15    prospective sales.  That case was cited with approval in

16    *Maryland Shall Issue.  Maryland Shall Issue* was a case

17    involving those sales at the time to young people who didn't

18    have the license that was required by the state.  So these

19    were all prospective sales that were being complained of.

20         THE COURT:  But they were already in the state,

21    doing business and making sales?

22         MR. FREDERICK:  Yes, Your Honor.  And if -- I

23    would say it's not a pleading requirement.  Because the

24    pleading requirement is that there be a loss potential for

25    sales.

1      We can establish evidence, if put to the proof, that

2  there have been past sales by GenBioPro of mifepristone in

3  West Virginia.  We didn't think it was necessary to plead

4  that.

5      We would urge you to not require us to go through the

6  mechanics of amending the Complaint.  We can provide

7  evidence of that, if necessary, at cross-motions for summary

8  judgment.

9          THE COURT:  I wish you had said that when you saw

10  their initial attack -- and I don't -- by saying I wish you

11  had, I'm not criticizing you, I just think if you -- I think

12  it's really clear if you would have alleged that you were

13  already conducting transactions -- and I'm not saying you're

14  wrong.  I'm still pondering all this.  And I understand your

15  position and why you would take the position that you don't

16  need to allege nor even have had past sales.

17          MR. FREDERICK:  There is also a Tenth Circuit case

18  called *303 Creative*.  And in that case, the website designer

19  had not yet started to make websites that would be -- that

20  would implicate questions about same-sex marriage.  There

21  was only a prospective creation of the website there.

22      And let me explain to you exactly why it shouldn't

23  matter in this particular case.

24      West Virginia enacted its Criminal Abortion Ban in

25  September of 2022.  To our knowledge, people complied with

1    that and have not had any sales in that time period.

2        In January of 2023, the FDA promulgated new risk

3    mitigation strategies.  These are REMS.

4        THE COURT:  Right.

5        MR. FREDERICK:  That is the name for them.  And

6    these REMS provided for telemedicine, for mail order

7    provision of mifepristone.  And so the direct collision

8    occurred.  And so if you would suppose that there had been

9    an abortion ban throughout this entire period, it would be

10    odd to think that the plaintiff can only get standing by

11    showing violation of the law through sales that would be in

12    conflict with the state law.

13        GenBioPro is a law-abiding company and is seeking

14    through legal means to come up with the appropriate answer.

15        And so if you think about the logic of their position,

16    it actually doesn't make sense, because it would mean that a

17    state could act unconstitutionally to constrict an

18    out-of-state distributor's products.  And then if the

19    federal government changed the rules that would have enabled

20    that product to be distributed for sale in a state, under

21    their theory of standing, there is no standing because there

22    was no prior sale.

23        And so I think that if you think about it from a

24    logical perspective, it can't be a pleading standard.

25        If you look at *Craig versus Boren*, *Maryland Shall*

 1    *Issue*, the *Ezell* case, there was no -- there was no prior

 2    sale to the target audience.  It can't be a pleading

 3    requirement.

 4         But if you think that we need to provide evidence to

 5    that effect, we can show some evidence of past sales in

 6    prior periods.

 7         So if that's the only issue that's hanging you up about

 8    standing, I hope I've adequately --

 9              THE COURT:  Well, I appreciate -- and you have

10    responded to my questions, but I'm not going to say that's

11    the only issue hanging me up.

12         I reserve the right to review all of this and make a

13    ruling based upon all of it.  But you've certainly explained

14    your injury in fact theory.  And I understand when I looked

15    at these cases, one of the things that occurred to me,

16    especially in the context of the defendants' argument, was

17    that even though you had been in the business in 2019 -- and

18    I understand that the recent REMS changed the landscape

19    considerably, and would have expanded the possibility of

20    business -- as you've acknowledged, it's a pleading stage

21    standard.  But the Court can't just accept a conclusory

22    statement that we have standing because we have an injury in

23    fact.  You have to demonstrate, plausibly allege what that

24    is.  And I appreciate your answering those questions for me

25    here today.

1          MR. FREDERICK:  All right.  And I can point you to

2     the paragraphs of the Complaint that we think adequately --

3          THE COURT:  Why don't we do that, just to make

4     sure we are on the same page as we go through this.

5          MR. FREDERICK:  Sure.  So paragraph 3 pleads that

6     the company provides medication abortion, and that is a form

7     of ending pregnancy that is used now in more than half of

8     all instances in the United States.

9          Paragraph 11 explains that the Ban constricts the

10    market for mifepristone.

11         Paragraph 74 explains that the West Virginia sales Ban

12    constricts West Virginia sales.

13         Paragraphs 78 through 80 explain how pharmacies, both

14    brick and mortar pharmacies like Walgreens and CVS, and a

15    mail order pharmacy known as HoneyBee, would provide

16    mifepristone to persons here in the state.

17         And paragraph 110 alleges that there's a constriction

18    of the market.

19         We think those -- we easily satisfy plausibility.

20         THE COURT:  Right.  And, as I recall, you

21    explicitly alleged in one of those paragraphs that the big

22    pharmacies had publicly stated an intention at some point to

23    distribute the drugs.

24         Is that correct?

25         MR. FREDERICK:  That's correct.

1              THE COURT:  And I guess that since -- maybe not so

2    clear, as I understand it, and -- but it's not part of the

3    pleadings -- one or more of these pharmacies have now

4    indicated some hesitation about getting into the

5    distribution of mifepristone in those states where attorney

6    generals have said that there should -- that the Ban should

7    prohibit it.

8              MR. FREDERICK:  That brings me to third-party

9    enforcement, because the attorney general here has signed

10   one of those letters that threaten Walgreens, one of the

11   pharmacies that said it would comply with the 2023 REMS to

12   provide mifepristone in its pharmacy.

13        And in the February 1 letter that the attorney general

14   cosigned with the Attorney General of Kansas, threatened

15   Walgreens with a civil RICO action.

16        And that threat, we think, brings four square in the

17   third-party enforcement doctrine of standing.

18             THE COURT:  Before we get to that, let's cover the

19   other bases.

20        You've acknowledged injury in fact, traceability, and

21   redressability.  So let's not get into the local prosecutor

22   and the pre-enforcement issue raised there.

23        Tell me what your response is to the defendants'

24   arguments about traceability and redressability with respect

25   to your injury in fact based standing as a -- for economic

1     loss.

2             MR. FREDERICK:  Sure.  Let me start with

3     traceability.

4        Both of the defendants have the authority to enforce

5     the law in West Virginia, and neither have disavowed an

6     enforcement intent relating to the Ban.

7        Under the *Susan B. Anthony* case, that is sufficient for

8     justiciability in terms of traceability where the government

9     has not disavowed enforcement of the unconstitutional law.

10       We cite other cases in our opposition briefs at 7 and

11    4, that I think well explained the principal here.

12       The defendants' commitment to enforcing an

13    unconstitutional law is causing West Virginians not to

14    purchase or prescribe GenBioPro's product.  And that's

15    sufficient for traceability.

16       The *303 Creative* case is on point for this, where the

17    Court said an injury in fact is fairly traceable to a

18    defendant if the defendant is charged with the

19    responsibility to enforce the statute.

20       And in the Fourth Circuit, the *Libertarian Party* case

21    says that traceability only requires the defendants have,

22    quote, "some part" in causing plaintiff's harm.

23       Now, as the sequence that you described, which will

24    play itself out in pleading and, in fact, the statements of

25    enforcement by the defendants have chilled the market for

1    GenBioPro's product.  That's sufficient to show the

2    traceability necessary for standing purposes to challenge

3    the unconstitutionality.

4              THE COURT:  I take it that the enforcement you're

5    talking about, primarily, is enforcement of the so-called

6    Unborn Child Act, the Ban -- abortion prohibition, the most

7    recent of the acts by the state legislature.  And as I read

8    it, it certainly greatly restricts when any abortion can be

9    performed within the state.  It requires, of course, that it

10   be by a medical provider.  And that in combination with the

11   earlier statute, which literally criminalizes an illegal

12   abortion, you're really talking about enforcement, both in

13   terms of exposure to a criminal charge, as well as exposure

14   to a licensing revocation or suspension with regard to any

15   doctor or pharmacy.

16             MR. FREDERICK:  That's correct.  And even

17   GenBioPro itself, even though it is an out-of-state

18   distributor of mifepristone, falls within an overly broad

19   and vague definition of an attempt to perform or induce an

20   abortion.  The definition under state code 16-2R-2 says that

21   abortion means -- that an attempt to perform or induce means

22   an act that constitutes a substantial step in the course of

23   conduct intended to culminate in an abortion.

24             THE COURT:  Almost a state Comstock Act.

25             MR. FREDERICK:  Well, it was -- you know, we can

1    talk about the Comstock Act in due course, but I just want

2    to start with the definition, which actually leads directly

3    one to think that it could conceivably encompass through its

4    vagueness a company like GenBioPro.

5        So I think that for these reasons, the traceability

6    goes right back to the statute and goes right back to the

7    activities that GenBioPro is seeking through its

8    distribution of mifepristone in West Virginia.

9        Now, as to redressability, we've asked for declaratory

10   judgment that the law is unconstitutional.  The pharmacies

11   that we cited in our Complaint said that in those states

12   where it is not illegal, they would distribute the product

13   in their pharmacies.  We think that's sufficient for

14   redressability.

15       The laws that have been enforced by the defendants have

16   caused the injury from preventing the sale of the product in

17   the state.  So we think we meet each of the elements of

18   standing just as a direct entity by GenBioPro itself.

19       We think it also satisfies third-party standing,

20   because the providers that you mentioned who face the harm

21   and risk of possible enforcement against them are within the

22   zone protectable by a vendor.

23       *Craig versus Boren* established that principle almost 50

24   years ago when the gentleman who wanted to buy 3.2 beer

25   underage eventually got older than the age prescribed by the

1   statute, but the Supreme Court said that the seller of the

2   3.2 beer was able to assert third-party standing on behalf

3   of those whose equal protection rights were being bridged by

4   the Oklahoma statute there.

5        So we think that there is adequate grounds for both the

6   third-party standing, the threat of enforcement provides

7   adequate standing, and the ability of the vendor here in a

8   better position actually because of hindrances, the cost of

9   litigation, the expense, the difficulty of litigation for

10  individuals, to say nothing of, you know, the concerns with

11  making our product available for sale in the state, I think

12  adequately satisfies all of the relevant standing

13  requirements.

14       THE COURT:  And then with respect to threat of

15  enforcement as a basis to hold in the county prosecutor, it

16  is because the county prosecutor could seek criminal

17  enforcement against your customers, but you argue, even

18  against GenBioPro?

19       MR. FREDERICK:  Well, that -- I'm not inviting

20  that, Your Honor.

21       THE COURT:  Right.

22       MR. FREDERICK:  I'm saying that the vagueness of

23  the statute raises the specter of that, and that is

24  sufficient for standing.

25       The fact that there are Walgreens stores and pharmacies

1    in the Putnam County area that are potentially subject to

2    prosecution is sufficient for the threat of enforcement

3    aspect of standing.  And -- and it is a real thing, based on

4    the circumstances that I've laid out, that we can make it a

5    full or factual presentation at summary judgment if the

6    Court views the pleading plausible now is sufficient, which

7    we think that the Court should.

8              THE COURT:  All right.  Thank you.

9              MR. FREDERICK:  I've got nothing further on

10   standing, unless there are questions that you have.  I'd

11   like to save some time for rebuttal, if I might.

12             THE COURT:  Oh, you will.  That's fine.

13        All right.

14             MR. CAPEHART:  Thank you, Your Honor.

15        I just want to make sure everyone can hear.  Is the

16   microphone picking up well?

17        (Pause.)

18             THE COURT:  I'm sorry.  Go ahead.

19             MR. CAPEHART:  Not a problem, Your Honor.

20        First of all, I just want to take a moment to clarify a

21   couple of things, and especially about how the Unborn Child

22   Protection Act works, especially following some of the

23   concerns about the definition of abortion, because I'm not

24   sure -- I'm not reading it maybe the way that counsel is

25   over here.

1          Looking at it, an abortion means the use of any

2     instrument, medicine, drug, or any other substance or device

3     with the intent to terminate a pregnancy of a patient known

4     to be pregnant, and with an intent to cause the death and

5     expulsion or removal of an embryo or fetus.

6          It also goes on to clarify what the definition does not

7     mean.  I'm not sure I've seen anything from there that leads

8     me to believe that anyone would ever try to look at the

9     manufacturer of an abortion drug and the shipment or sale of

10    that abortion drug in West Virginia as somehow something to

11    be controlled or to be looked at as an abortion.

12              THE COURT:  It wouldn't be the use of the

13    medicine?

14              MR. CAPEHART:  The use of the medicine would be,

15    but the manufacturer, absolutely not.

16              THE COURT:  Well, okay.  I mean, here, you're

17    talking about the manufacture and distribution through the

18    sale.

19              MR. CAPEHART:  Correct.

20              THE COURT:  I take it that at this point neither

21    the attorney general nor the prosecutor have announced any

22    policy response to that argument and disavowed any

23    possibility of bringing a criminal prosecution against the

24    maker of the drug.  And I say that in the context, frankly,

25    of you raising the Comstock Act as a possible violation.

GenBioPro v Sorsaia, et. Al.

```
 1    It's federal law.  It's not enforceable by you guys, but

 2    you've raised that as a possible consequence of the

 3    manufacturer's decision to produce or to manufacture and

 4    sell in the state, and thereby transport over interstate

 5    commerce.

 6         So it really -- I appreciate what you're saying, but

 7    I -- I don't think I could find that as a persuasive

 8    declaration that there is no exposure to criminal

 9    prosecution.

10              MR. CAPEHART:  Well, and I appreciate the

11    opportunity here on the record to clarify some of these

12    things, because I think there has been a bit of a

13    misapprehension as to exactly what the purpose of the

14    statute is.  And I can't speak to what a prosecuting

15    attorney would do as the principal prosecuting arm of the

16    state government vis-a-vis the criminal code, 61-2-8.

17    That's the prosecutor's decision.  I'll let the prosecutor's

18    office speak to that.

19         But in terms of our read of what the Unborn Child

20    Protection Act was about, it's all about the regulation of

21    the practice of abortion, and also of the practice of

22    medicine as it relates thereto.  It's limiting only that

23    practice to those persons identified within the statute as

24    being capable of performing legal abortions that may

25    continue and may happen within the bounds of the Unborn
```

1    Child Protection Act, which there certainly are some.

2            THE COURT:  Even if that is the case, does that

3    really change the Court's analysis?  The plaintiffs have

4    asserted that they have third-party standing on behalf of

5    their putative customers, and those are the people that are

6    clearly exposed to criminal prosecution if they use the

7    plaintiff's product to perform an abortion.

8            MR. CAPEHART:  Not to step on the prosecutor's

9    toes, but my reading of the criminal statute of 61-2-8 is to

10   clarify that those persons who are not identified within the

11   Unborn Child Protection Act as being permitted to perform

12   abortions are creating -- excuse me -- are performing a

13   criminal act to induce or perform an abortion.

14       That clarifies that only those persons identified in

15   the Unborn Child Protection Act may ever be the group of

16   persons who could conduct a legal abortion.  Anyone else,

17   potentially, is subject to criminal prosecution.

18           THE COURT:  Well, maybe I'm missing something

19   here.

20       So the state's criminal statute criminalizes abortions

21   performed other than those that are narrowly permitted under

22   the statute.

23           MR. CAPEHART:  Correct.

24           THE COURT:  So the plaintiffs are arguing that

25   that narrow permission for abortion under the West Virginia

1    statute, and particularly the most recent one, effectively

2    limits when their product can be used by a medical provider

3    in West Virginia to perform an abortion.  And so I -- it's

4    clear to me then that the doctors and/or pharmacies who

5    use -- who purchase and use mifepristone in a way that's

6    outside of the West Virginia statute are clearly subject to

7    criminal prosecution.

8         What am I missing?

9         MR. CAPEHART:  You're saying that if someone were

10   to perform a purely elective abortion, which the Unborn

11   Child Protection Act does not permit, that would be an act

12   outside of the law, that those are no longer legal in West

13   Virginia.

14        THE COURT:  Right.

15        MR. CAPEHART:  And anyone who wants to perform one

16   of those violates the Unborn Child Protection Act, and then

17   similarly would be subject to some kind of criminal

18   prosecution.  But that's about the practice of abortion.

19        That's not about this manufacturer or their product or

20   how someone utilizes their product.  Their product is

21   utilized perfectly legally.  And as I read it, I don't see

22   how use of their product subjects them to liability any more

23   than the use of the Louisville Slugger crime subjects --

24        THE COURT:  Well, I believe the whole point of

25   their lawsuit is that under the Commerce Clause and the

1    Supremacy Clause the statute you're defending constricts

2    when their products can be used.  And so I don't think

3    we're -- maybe we are just not connecting with each other.

4         But it seems pretty clear to me that their claims are

5    that because of the restrictive market for their product

6    created by West Virginia's strict abortion laws violates --

7    results in a violation of the Commerce Clause and the

8    Supremacy Clause.

9         We're going to argue later, obviously, about whether it

10   does and all that, but those are the two claims that they've

11   raised, and very clearly they're arguing -- they're claiming

12   that you have constricted the market for their product and

13   that's caused them economic injury, and so they have

14   standing to bring the claims because of their own economic

15   injury.  And, obviously, bringing -- a vendor can bring

16   claims under the Commerce or Supremacy Clause where they

17   most likely are here.

18        And so, I mean, maybe I'm missing something that you're

19   saying and I'm just not able to hear it right.

20        But pretty clearly, it seems to me, they have claimed

21   injury in fact to bring these claims based upon those

22   circumstances.  And the threat of prosecution arises because

23   the attorney general and/or the county prosecutor can

24   prosecute their customers for criminal violations for the

25   use of their product in performing an abortion that's

1    outside of the restrictions that the state has imposed.

2              MR. CAPEHART:  I guess we just never looked at

3    that, subjecting them to any kind of criminality.

4              THE COURT:  Well, there's two things to think

5    about here.  One is that -- whether they have standing or

6    not is not dependent upon the cause of action they raise.

7         Clearly, the Court says that standing is determined

8    based -- it is a constitutional requirement that has to be

9    met in order to consider a party -- a party who can properly

10   raise whatever claims they might have.  And so they don't

11   have to have standing just based upon -- they don't have to

12   prove their economic injury results from a Commerce Clause

13   or a Supremacy Clause violation.

14        Standing is determined, whether they have a sufficient

15   interest to be recognized by a court as a proper party to

16   bring whatever claims they have.

17        And so here, that's obviously what they are claiming,

18   that they have an economic loss.

19        And I don't think you all dispute the economic loss, or

20   do you?  I mean, is that what you're saying now?

21             MR. CAPEHART:  No.  I think to the extent that --

22   that one would state that there may be fewer abortions after

23   the passing of the statute as compared to before, it's

24   entirely possible.  I don't know that.  I haven't seen any

25   data on that.

1          THE COURT:  Well, irrespective of -- irrespective

2     of how many abortions are performed, whether it's up or

3     down, their claim is that their product will not be able to

4     be used to the, I guess, sort of the full extent that it's

5     designed to be used, because of the restrictions the state

6     imposes.

7          So that's their injury in fact is the economic loss

8     from not being able to market and sell their product as

9     extensively as they otherwise could, given the FDA approval.

10          MR. CAPEHART:  Well, and I guess on that point,

11     Your Honor, we still believe that that's a bit of a

12     speculative argument in the first place.  And it's -- I

13     appreciate some of the clarifications that counsel provided.

14          I don't know that we ever read any of those paragraphs

15     of the Complaint to assert that there was affirmatively any

16     sale in West Virginia.

17          THE COURT:  Well, I agree.  It's kind of where we

18     started.  They did not allege that they have had any past

19     sales.

20          Now, they say that they have, and they could, but we

21     are not to that point.

22          Based purely upon their pleading, they did not claim

23     that they had already had sales.  I don't think they even

24     claimed -- in West Virginia -- I don't think they even

25     claimed that they had any sort of a contractual or similar

1    relationship with any doctor or pharmacy.

2        But what they have clearly alleged is that they have

3    been in the business of making this generic for three years,

4    and they have sold it widely across the United States.  And

5    they have even claimed that specifically under the latest

6    REMS -- R-E-M-S -- they could have, and they could

7    distribute through a pharmacy, and that they specifically

8    alleged one or more of these big chains announced that they

9    were going to distribute the drug.

10        And so I agree they haven't alleged what I examined Mr.

11   Frederick about, past sales, or even a current existing

12   operation of sales within the state, but they've alleged

13   something different.

14        And so the question is is that enough?

15        MR. CAPEHART:  And we have, obviously, taken the

16   position, Your Honor, that, no, it's not.

17        The fact that a market participant can come to a market

18   that it's never been a part of and allege that its share of

19   the market or its customer base in a market that it's never

20   been present in has been somehow constricted, even though

21   they've never had a share of that market, seems like a

22   bridge too far.  Especially, you know, as we've been saying,

23   I see no reason to believe that there actually have been

24   sales.

25        In fact, it would be a bit of a concern, perhaps,

1    because the manufacturer BioPro lacks the manufacturer's

2    license required by the Board of Pharmacy to send their

3    materials into West Virginia.  That's wholly lacking.  So

4    that would be a violation of West Virginia law.

5         I don't know that that's --

6              THE COURT:  I don't mind telling you, when I went

7    through all this and at that point decided that I wanted to

8    have a hearing on it to get full argument out here, one of

9    my concerns about the injury in fact allegations of the

10   plaintiff is whether or not it fell somehow on that side of

11   the continuum towards like *Lujan* and those cases, where the

12   Court talked about people -- plaintiffs can't just sort of

13   speculate that they are going to do something that would

14   give them standing.

15        And the Court has been, I guess, fairly clear and

16   consistent that generalized grievances argue that you can't

17   just come in and say, well, I'm one of the many people who

18   object to this.  I don't like this policy.

19        That's not enough to give standing.  Taxpayers don't

20   automatically have standing to challenge every spending

21   decision.

22        And so here, my dilemma was looking at, you know, sort

23   of the continuum of conduct that might fall within the

24   economic loss line.  Have they crossed that threshold from

25   being sort of speculative and generalized intent to do

GenBioPro v Sorsaia, et. Al.

1    something, like conduct sales, or -- or do they meet the

2    test because of what they've done.

3        And, you know, I'm not going to -- I'm not going to

4    decide this sitting up here on the bench today.  I never

5    feel comfortable doing that.  But, to be honest with you,

6    because I want you to be able to respond, the closer we've

7    gotten to this hearing, the more inclined I am to conclude

8    that there is injury in fact; that they don't have to have

9    that level of contact and sales within the state that they

10   might have to have for some other purpose; for instance, to

11   be conducting business for personal jurisdiction or

12   something like that.

13       Here, this company has been making this generic for

14   three years.  They've alleged that they sell it nationwide.

15       Clearly, under the REMS, they've got a new sort of

16   class of customers in that pharmacies can deal with this

17   directly.  And they've also got, under the FDA approvals, an

18   increased sort of possibility of business because doctors

19   could do it through telemedicine and other things like that.

20       And so, you know, those don't seem -- it doesn't seem

21   that GenBioPro is just some pharmaceutical company that

22   wants to get into the business and is coming to West

23   Virginia to challenge restrictive laws.

24       They are in the business.  And it sounds like they've

25   been performing business activities consistent with their

GenBioPro v Sorsaia, et. Al.

1    claims.  And the claims are not simply conclusory; they're

2    plausible claims that pharmacies located throughout West

3    Virginia, including Putnam County, have indicated an

4    intention -- or at least they had at the time of the suit --

5    to be involved in the distribution, and that this is a drug

6    that is becoming more widely-accepted, and is now, as I

7    think they allege -- and I think I probably read this

8    somewhere in the papers, too -- it is the predominant form

9    of medical abortions.  That using a -- this drug is more

10   common than not when it comes to performing a lawful

11   abortion.

12        So all of that seems to me to start tipping in the

13   balance much more towards the plaintiff and a finding that

14   this is not a generalized grievance, this is not a

15   speculative economic loss, that this is something pretty

16   direct.

17             MR. CAPEHART:  I think our position has always

18   been that it looks speculative and somewhat remote.  And

19   given the fact, as you said, they received generic approval

20   in 2019 from FDA, yet have never -- as far as we know from

21   the pleadings or from some other records -- had any access

22   to West Virginia or availed themselves of it.

23        So they've been doing it for four years and never been

24   here before.  Now they're here, still with zero contacts,

25   from everything that we can see.  That looks very, very

 1    speculative.  And if that there is some sort of intent

 2    desire, hardened goal to be into the West Virginia market,

 3    when that's never been present before or evident in many

 4    ways, again, by the fact that they do not have the single

 5    manufacturer's license that every manufacturer is required

 6    to have when sending their drug products to West Virginia,

 7    that's a pretty easy get.  And lacking even that after four

 8    months of litigation doesn't speak to me as though someone

 9    who is really trying to get into the market.

10         THE COURT:  All right.  I appreciate that.

11      Thank you.

12      What else do you want to say?

13      Well, let me ask you this -- I didn't want to interrupt

14    you.

15      Mr. Frederick cited a couple cases, a Seventh Circuit

16    case, and then another one, where there were not direct

17    sales in the targeted state at or before the time of the

18    lawsuit being filed.  So --

19         MR. CAPEHART:  I'm afraid I don't have absolute

20    command of those right in front of my mind, Your Honor.

21    But, if I recall correctly, it's still involved with an

22    outright total ban of the some type of activity I think was

23    the --

24         THE COURT:  The gun range case?

25         MR. CAPEHART:  The firing range case, yes.  Which

 1    is obviously not the case here.  There is nothing in West

 2    Virginia law that serves as any impediment to a drug

 3    manufacturer coming in, marketing and selling it, except the

 4    licensure through the boards of pharmacy and whatnot.

 5            THE COURT:  In the *Maryland Shall Issue* case and

 6    in the *Craig v Boren*, these were businesses that had a whole

 7    lot more sales going on than just the sales that were

 8    affected by the state's restrictions that were being

 9    challenged.

10            MR. CAPEHART:  And they were active in the

11    marketplace prior to the change in code, which is obviously

12    not the case here.

13            THE COURT:  Okay.  Anything else you want to bring

14    up on traceability or redressability with respect to

15    GenBioPro standing?

16            MR. CAPEHART:  No.  I think we've touched on a lot

17    of the things that I was going to try and get into, Your

18    Honor.

19            THE COURT:  Do you want to address separately

20    third-party standing?

21            MR. CAPEHART:  In terms of redressability?  In

22    terms of --

23            THE COURT:  Well, with any of these things, I

24    guess.  I mean, as I understand the law, if a party has

25    standing, they may also seek third-party standing where they

GenBioPro v Sorsaia, et. Al.

1     stand in the shoes of some other personal entity and be able

2     to bring -- they would have standing to bring claims

3     consistent with what those claims would be here.

4          And GenBioPro is arguing that it has third-party

5     standing on behalf of pharmacies and doctors that would

6     otherwise -- it would be their customers if these

7     restrictions were found to be -- determined to be

8     unconstitutional.

9               MR. CAPEHART:  Well, and I think in regard to

10    pharmacies, again, as I was saying earlier, I don't see how

11    pharmacies are implicated by the statutes that are being

12    challenged.  It's about the practice of medicine, and also

13    about the criminality of the act of performing an illegal

14    abortion under state law.

15         The pharmacies don't deal with that.  They are simply

16    in the process -- they exist to dispense medications per

17    prescriptions by doctors, which is something that a

18    pharmacy -- and, obviously, talking about mifepristone --

19    one would have to be properly trained and have the proper

20    certification under the REMS so that they could dispense it

21    in the first place.

22         And I may be wrong, but I'm not sure that there is

23    actually one in West Virginia.  I think HoneyBee is a

24    mail-order pharmacy that is outside West Virginia that wants

25    to ship them here.  But I don't believe there is a physical

1    pharmacy in West Virginia that has been certified by

2    GenBioPro to dispense their medications.

3         Again, we don't see how pharmacies are directly

4    implicated or regulated by any of the statutes in play.  The

5    physicians are, but the physicians are through the practice

6    of medicine.  That's wholly bound to the state to decide.

7    That's made that pretty clear.

8              THE COURT:  All right.  Okay.  Anything else?

9              MR. CAPEHART:  Not at this time.

10             THE COURT:  All right.

11             MS. SCRAGG KARR:  Thank you, Your Honor.

12        Jennifer Scragg Karr, representing Mark Sorsaia, the

13   prosecuting attorney.

14             THE COURT:  Tell me his name again.  I have met

15   him and I've heard his name for years, but -- well, I've

16   read it for years.  I don't hear it very often.

17             MS. SCRAGG KARR:  It is Sorsaia.

18             THE COURT:  Sorsaia, all right.  All right, thank

19   you.

20             MS. SCRAGG KARR:  And so I will just discuss why

21   you should dismiss this claim against Mark Sorsaia.  And

22   that is because, as the prosecuting attorney, he is only in

23   the business of prosecuting crimes.  And this plaintiff

24   doesn't have a stake in the controversy of prosecuting

25   crimes, because when you look at what is a crime under our

1    new state law, the legislature enacted the Chapter 16,

2    Section 2R.  And when you look at that, the only thing that

3    is an actual crime, when it comes to abortion, is under

4    61-2-8.

5         And when you read the criminal statute, it actually

6    exempts a licensed medical professional, and it exempts a

7    pregnant female who is having --

8         So as it relates to this plaintiff, the plaintiff would

9    be dispensing a pill pursuant to a licensed medical

10   professional requesting it, giving a prescription, and the

11   pharmacist filling it.  So because the doctor and the

12   pharmacist are licensed medical professionals, we as a

13   prosecutor could not prosecute them for a crime.

14         THE COURT:  But if they -- if, in all of those

15   circumstances, they were a licensed medical provider, they

16   got the drug from a licensed pharmacy that was manufactured

17   by the plaintiff, if they performed an abortion using that

18   drug, and that abortion was outside the restrictions that

19   the State of West Virginia imposed in both of these Acts,

20   but, in particular, the more recent more restrictive Act,

21   they would be subject -- that provider would be subject to

22   prosecution for a crime.

23         MS. SCRAGG KARR:  No, because they are exempt.

24   Under the statute, it says, any person other than a licensed

25   medical professional, as defined in 16-2R-2 -- which talks

1   about how they have to be licensed in West Virginia -- who

2   would then do a -- knowingly and willfully perform, induce,

3   or attempt to perform an abortion.

4        So it's any person other than that licensed medical

5   professional.

6        So I think in this case what the plaintiff is probably

7   looking at is the medical professional would be at -- have

8   the potential to have their license revoked if they

9   prescribed this pill in violation of the code section.

10           THE COURT:  But you think that's the only penalty

11  that a licensed provider would be subject to if they

12  performed an abortion at 18 weeks, using mifepristone?  And

13  I know that's outside of the time they said.

14           MS. SCRAGG KARR:  That's correct.  That's how I

15  read the statute.  So by having that licensed medical -- the

16  medical license would prevent them from being prosecuted.

17           THE COURT:  Okay.  Thank you.

18       (An off-the-record discussion was held between the

19  Court and law clerk.)

20           THE COURT:  All right.  And my clerk is reminding

21  me that the penalty section provides that on the first

22  instance of a violation, they can be sanctioned on their

23  license, but if they did it again, a second one, they'd be

24  subject to criminal penalties.

25           MS. SCRAGG KARR:  Well, actually what it says at

1    subsection (b) of that 61-2-8, and that says, a person who

2    was formerly a licensed medical professional.

3         Then -- and so, still again, they would be a person who

4    no longer was a licensed medical professional.  So

5    regardless of how many abortions the medical professional

6    would have authorized or conducted, it wouldn't matter under

7    that code section.

8         I think what maybe your law clerk is thinking is once

9    they would perform an illegal abortion or have one

10   performed, then they would lose their license through a

11   procedure of the code, and then once they lost that, if they

12   did another one, they could be prosecuted.  That would be

13   true.  They would no longer be a medical professional.

14             THE COURT:  All right.  Thank you for clarifying

15   that.

16        All right, anything else?

17             MS. SCRAGG KARR:  No, Your Honor.

18             THE COURT:  I'll give you've a few minutes for

19   rebuttal.

20             MR. FREDERICK:  Let me start with the prosecutor,

21   because the prosecutor has not disavowed an intent to

22   enforce the statute.  And that failure to disavow is

23   particularly critical for pharmacies, which are not exempt

24   from the statute, or nurse practitioners, who are not exempt

25   from the statute, and who, under the FDA guidance, are able

1    to provide mifepristone to pregnant women.

2         And so however much today's argument might focus on

3    doctors, it doesn't address an issue that goes to standing

4    under the third-party doctrine, under pre-enforcement

5    challenges, which they don't acknowledge.

6         We are allowed to bring a pre-enforcement challenge to

7    the law under the *Susan B. Anthony* case.  And by the plain

8    terms of the state statute, it encompasses people that are

9    protected by the FDA 2023 REMS.

10        The Ban includes criminal penalties for pharmacies at

11   61-2-8, which we cited in our opposition to the prosecutor's

12   motion at 11, pharmacists are not licensed medical

13   professionals within the meaning of the statute.  And

14   because they face criminal penalties, I think that the

15   prosecutor really, respectfully, has to stay in the case.

16   There is not a way to avoid that, given past statements

17   about intending to enforce the statute as it is written.

18        With respect to the attorney general, I'm perplexed by

19   the argument made today, frankly, because what the attorney

20   general seems to be saying is that we can -- we can go after

21   all the people who create the market for mifepristone, the

22   doctors, the pharmacists, the nurse practitioners and

23   everybody else, and it doesn't matter that it constricts

24   your economic losses.  Somehow the maker of the drug and the

25   distributor in the state of the drug doesn't have standing

1     to say the state law is unconstitutional.

2          That doesn't make any sense.

3          And the fact that the *Ezell* case is pretty much on

4     point -- and let me give you the citation.  It is 62 F.3d at

5     692, Your Honor -- says that the firing range facility

6     operator intended to create a facility in Chicago.  It

7     didn't have one at the time.  It was doing them throughout

8     the nation.

9          So it simply can't be the case that someone seeking to

10    do business in a location but for a constitutional

11    prohibition lacks standing in order to challenge the

12    unconstitutionality of the statute.

13         I'm happy to address any of the other issues, but I

14    don't think there is a serious argument here today that we

15    lack standing to challenge the West Virginia statute.

16         And I look forward to the Court's decision and the

17    opportunity to litigate the merits further.

18              THE COURT:  All right.  Thank you.

19         So you can take your seat.

20         Here's my plan.  I would decide this within the next

21    few days.  I'll get started today.  And within the next

22    several days, I'll make a decision.  And if I think I can

23    get an opinion written on it within a few more days, like

24    the next week or 10 days, you'll just hear -- you'll get all

25    that at once, one way or the other.

1        If I think it's going to take me much longer than that,

2    for some reason, then I might short-order just saying that

3    we have found or not found standing and an opinion will

4    follow.

5        A lot of it just depends on what else comes into the

6    Court that I've got to address between now and then, but my

7    plan would be to decide this pretty quickly.

8        If I decide there is standing, then what I would hope

9    to do is -- if I cannot get too distracted by other cases --

10   to spend enough time on the other issues that are raised in

11   the motion to dismiss, so that I can have a meaningful

12   argument session with you again.  And I'm really hoping I

13   can do that within the next month.

14       My plan would be to try to -- if I can get up to speed

15   on it -- bring you in some time in the middle, latter part

16   of May and let you do oral argument on the remaining issues.

17   And then be prepared to submit it and try to get it decided

18   as quickly as I can at that point.  Okay?

19       As much as I can do.  All right.

20       Thank you all for your appearance today and your

21   argument.  I appreciate it.

22       (Proceedings concluded at 2:55 p.m.)

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2         I, Catherine Schutte-Stant, Federal Official Realtime

 3   Court Reporter, in and for the United States District Court

 4   for the Southern District of West Virginia, do hereby

 5   certify that, pursuant to Section 753, Title 28, United

 6   States Code, the foregoing is a true and correct transcript

 7   of the stenographically reported proceedings held in the

 8   above-entitled matter and that the transcript page format is

 9   in conformance with the regulations of the Judicial

10   Conference of the United States.

11

12         s/Catherine Schutte-Stant, RDR, CRR

13         _____  May 17, 2023

14         Catherine Schutte-Stant, RDR, CRR
           Federal Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25
```